**UNITED DISTRICT COURT**
**FOR THE EASTERN DISCTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **LILLIAN LOUISE MORGAN VOGT,** **individually and as the Representative of a** **class of similarly situated persons,** | |
| **Plaintiffs,** | |
| **v.** | Cause No.: 4:22-CV-00385-SRC |
| **PROGRESSIVE CASUALTY** **INUSRANCE COMPANY,** | |
| **Defendant.** | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER**
**MOTION FOR CLASS CERTIFICATION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

SUMMARY OF ALLEGATIONS AND CLASS DEFINITION ......................................2

    I.      MISSOURI SALVAGE TITLING LAW ...............................................2

    II.     FACTUAL BACKGROUND ................................................................3

    III.    CLASS DEFINITIONS .......................................................................6

ARGUMENT FOR CLASS CERTIFICATION ................................................................6

    I.      THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(A) ......................................................................................7

         A.     Numerosity ...........................................................................7

         B.     Commonality .........................................................................8

         C.     Typicality .............................................................................9

         D.     Adequacy .............................................................................9

    II.     THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B) .....................................................................................10

         A.     The Putative Class Satisfies the Requirements of Rule 23(b)(2)...10

         B.     The Putative Class Satisfies the Requirements of Rule 23(b)(3)...11

         C.     Predominance .......................................................................11

         D.     Superiority ...........................................................................14

CONCLUSION ..........................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Amchem Prod., Inc. v. Windsor,*
   521 U.S. 591, 615, 625, (1997) ........................................................................... 12, 14

*Atkins v. United States,*
   No. 4:15 CV 933 CDP, 2016 WL 3878466, at *3 (E.D. Mo. July 18, 2016) ........................ 8

*Baugus v. Dir. of Revenue,*
   878 S.W.2d 39, 41 (Mo. 1994) ..................................................................................... 2

*Blades v. Monsanto Co.,*
   400 F.3d 562, 566 (8th Cir. 2005) ............................................................................. 12

*Boswell v. Panera Bread Co.,*
   311 F.R.D. at 529 ................................................................................................... 9, 11

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639 (2008) ................................................................................................. 13

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,*
   582 U.S. 497, 513 ................................................................................................... 14

*Campbell v. Purdue Pharma, L.P.,*
   No. 1:02-CV-00163-TCM, 2004 WL 5840206, at *11 (E.D. Mo. June 25, 2004) ............... 11

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC,*
   984 F.3d 595, 605 (8th Cir. 2020) ............................................................................. 14

*H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.,*
   546 F.3d 937, 942 (8th Cir. 2008) ............................................................................... 8

*Huyer v. Wells Fargo & Co.,*
   295 F.R.D. 332, 345 (S.D. Iowa 2013) ....................................................................... 10

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.,*
   716 F.3d 1057, 1064 (8th Cir. 2013) ........................................................................... 9

*In re Wholesale Grocery Prod. Antitrust Litig.,*
   No. 09-MD-2090 ADM/TNL, 2016 WL 4697338, at *7 (D. Minn. Sept. 7, 2016) ............... 7

*Johnson v. Meriter Health Servs. Emp. Ret. Plan,*
   702 F.3d 364, 372 (7th Cir. 2012) ............................................................................. 13

*Klay v. Humana, Inc.,*
   382 F.3d 1241, 1259-60 (11th Cir. 2004) ................................................................... 13

*Mosley v. Gen. Motors Corp.,*
   497 F.2d 1330, 1334 (8th Cir. 1974) ........................................................................... 8

*O'Brien v. B.L.C. Ins. Co.,*

768 S.W.2d 64, 68–69 (Mo. 1989) .......................................................................... 2

*Parke v. Progressive Cas. Ins. Co.*,
613 S.W.3d 428, 434 (Mo. Ct. App. 2020)............................................................... 2

*Paxton v. Union Nat. Bank*,
688 F.2d 552, 562–63 (8th Cir. 1982) ..................................................................... 9

*Perrin v. Papa John's Int'l, Inc.*,
No. 4:09CV01335 AGF, 2013 WL 688 5334, at *8 (E.D. Mo. Dec. 31, 2013).................... 15

*Portz v. St. Cloud State Univ.*,
297 F. Supp. 3d 929, 942 (D. Minn. 2018) ............................................................... 7

*Postawko v. Missouri Dep't of Corr.*,
910 F.3d 1030, 1039 (8th Cir. 2018) ....................................................................... 9

*Rilley v. MoneyMutual, LLC*,
329 F.R.D. 211, 215 (D. Minn. 2019)...................................................................... 6

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992, 998 (8th Cir. 2016) ........................................................................ 11

*Scott v. Blue Springs Ford Sales, Inc.*,
215 S.W.3d 145, 154, 181 (Mo. Ct. App. 2006)................................................... 3, 13

*Stuart v. State Farm Fire & Cas. Co.*,
910 F.3d 371, 374 (8th Cir. 2018) ..................................................................... 6, 12

*Tinsley v. Covenant Care Servs.*,
No. 1:14CV00026 ACL, 2016 WL 393577, at *8, *11  (E.D. Mo. Feb. 2, 2016) ............ 8, 14

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442, 453 (2016).................................................................................... 12

*Van Orden v. Meyers*,
No. 4:09CV00971 AGF, 2011 WL 4600688, at *9 (E.D. Mo. Sept. 30, 2011) ................... 10

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 359 (2011)..................................................................................... 8

*Windham v. Am. Brands, Inc.*,
565 F.2d 59, 67-68 (4th Cir. 1977) ....................................................................... 13

*Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604, 619 (8th Cir. 2011) ........................................................................ 12

**Statutes**

Mo. Rev. Stat. § 301.010 .............................................................................. 1, 2, 6

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................. 7, 10, 11

Federal Practice and Procedure § 1759, at 111–12 (1986) ............................................................. 7

Since 2015, Progressive violated Missouri law over 42,000 times by obtaining clean titles for salvage vehicles it obtained when settling total loss claims. Mo. Rev. Stat. § 301.010(55)(c). This systematic title laundering was not accidental. It allowed Progressive in some cases to receive more than double the vehicle's true salvage value, at the expense of unknowing consumers. Proof of the scheme is straightforward: Progressive's corporate titling guidelines violate Missouri law. And every element of liability is proven—for every class member—through Progressive's admissions, internal documents, and a claims spreadsheet that identifies every violation.

Every class member purchased a vehicle that Progressive illegally titled. And each class member is now in possession of a vehicle that, under Missouri law, cannot be driven on the roads. By obtaining a clean title for each vehicle, Progressive represented that either (1) the vehicle was not and had never been salvage or (2) that each vehicle was no longer salvage because it had been properly repaired and inspected. Yet neither was true. And, as a result, each class member was damaged in an identical way. Each now has a vehicle that is worthless—it cannot be legally driven and the cost to get it back on the road exceeds its value.

As in most classes, the amount of damage varies by class member. But that does not prevent certification. The measure of damages will be the same for each member: the difference between what the member paid and the actual value of the vehicle. Thus, each member will only be required to provide proof of what was paid for the vehicle. The value of each vehicle is zero. So, the math is simple. But even if it wasn't, Progressive's spreadsheet contains an admission of the salvage value for every member's vehicle. Thus, at worst, the damage is the difference between what was paid and what Progressive admits the vehicle was actually worth.

There are no barriers to class certification. A class is appropriate under Rule 23 and it is the only way to efficiently and fairly decide the legality of Progressive's titling practices.

1

## SUMMARY OF ALLEGATIONS AND CLASS DEFINITION

### I. MISSOURI SALVAGE TITLING LAW

"The purpose of the salvage title requirements is to inform subsequent purchasers of the vehicle's title history and, more broadly, to prevent damaged vehicles from ending up in the hands of unsuspecting downstream consumers." *Parke v. Progressive Cas. Ins. Co.*, 613 S.W.3d 428, 434 (Mo. Ct. App. 2020), *transfer denied* (citing *Baugus v. Dir. of Revenue*, 878 S.W.2d 39, 41 (Mo. 1994)). "[W]hen an insurance company fails to comply with salvage and odometer statutes, improper conduct by a person who may later come into possession of the certificate of title is foreseeable." *Id.* at 433 (citing *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 68–69 (Mo. 1989).

The Missouri Supreme Court has long held insurers liable for title-laundering activity. *See O'Brien*, 768 S.W.2d at 67–68 (affirming jury verdict against insurer for fraudulently selling a salvage vehicle to unscrupulous used car seller without obtaining a salvage certificate). Over 30 years ago, the *O'Brien* case put insurers on notice that they will suffer consequences if they arm unscrupulous sellers of salvage vehicles with clean titles. *See id.* One classic sign of the insurer's intentional conduct is receipt of far more than the salvage value of the vehicle in the sale to the unscrupulous buyer. *Id.* (insurer received $5000 for a vehicle with a salvage value of $2200).

Liability is based on violation of Missouri statutes, including five discreet, unambiguous categories of vehicles that qualify as a "salvage vehicle." MO. REV. STAT. § 301.010(55). The two relevant categories in this case define a salvage vehicle as one which either:

> Has been declared salvage by an insurance company as a result of settlement of a claim
>
> Or
>
> Was damaged during a year that is no more than six years after the manufacturer's model year designation for such vehicle to the extent that the total cost of repairs to rebuild or reconstruct the vehicle to its condition immediately before it was damaged for legal operation on the roads or highways exceeds eighty percent of the fair market value of the vehicle immediately preceding the time it was damaged

MO. REV. STAT. § 301.010(55)(a) and (c).

2

Missouri case law, on the other hand, informs the measure of damages when an unsuspecting consumer is saddled with a salvage vehicle. In *Scott v. Blue Springs Ford Sales*, the plaintiff was sold a vehicle, "which, unbeknownst to him, had been wrecked and on which a salvage title had been issued." *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 154 (Mo. Ct. App. 2006), *overruled on unrelated grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013). The plaintiff subsequently learned the vehicle's history when he was given a CarFax report by a repair shop, and immediately stopped driving the vehicle. *Id.* at 158. At trial:

> As to the actual value of the Explorer at the time of purchase, Scott testified that it had no value. He based his valuation on the fact he could not reasonably expect to sell it, due to its unsafe condition, resulting from the defective repairs of the damage to the Explorer from being wrecked.

*Id.* at 182. On appeal, the court stated, "an alleged fraud victim has two choices as to remedies: (1) he can rescind the contract and seek restitution; or (2) he can keep what he purchased and sue for the benefit of the bargain, which is calculated as the difference between the value as represented and the true value as of the date of purchase." *Id.* at 181. The defendant argued the vehicle must have some value to offset the price paid. *Id.* The Court rejected this argument, holding that "[a]s the owner of the Explorer, Scott was qualified to give an estimate of its fair market value, which the jury was free to believe, rejecting [Scott's expert's] testimony that the vehicle at the time of purchase was valued at $7,000." *Id.* "Thus, Scott's testimony was sufficient, alone, to support an award of compensatory damages of at least $15,500." *Id.*

*Scott* proves the value of salvage vehicles purchased by unsuspecting consumers can certainly be zero. So, the damages suffered when a plaintiff unknowingly purchases a salvage vehicle can easily be measured as the price the plaintiff paid for it.

## II.    FACTUAL BACKGROUND

On June 16, 2020, a Progressive insured 2014 Dodge Caravan (the "Caravan") was

involved in a single vehicle collision in Missouri. **Exhibit 1**, *Progressive Documents*, p. 2. On June 26, Progressive opened a salvage file and determined the vehicle was a total loss with a salvage value of $1,362.45. **Ex. 1**, p, 10. Progressive filled out a "Missouri Salvage Routing Form" for the Caravan. **Ex. 1**, p. 6. On June 30, Progressive assigned the Caravan to Copart, Progressive's "salvage vendor" in Missouri. **Ex. 1**, pp. 3, 16.

Progressive made payment to its insured on July 7, in the amount of $6,365.94, specifically declaring "Progressive Obtains Salvage" on the settlement payment sheet. **Ex. 1**, p. 7. By then, Progressive's adjuster had referred the claim to Progressive's National Salvage Unit ("NSU"). **Ex. 1**, p. 4. On July 14, Progressive stated the value of the Caravan immediately preceding the accident, called the Actual Cash Value ("ACV"), was $6,865.94. **Ex. 1**, pp. 1, 9. At the same time, Progressive stated the Cost to Repair the Caravan was $7,752.92, or 113% of the pre-accident value. **Ex. 1**, pp. 1, 9. Progressive admits the Caravan met its definition of "salvage." **Exhibit 2**, *deposition of Brant Gaumer*, p. 61:11-23. Nonetheless, Progressive instructed its salvage vendor to process an application for a clean, unbranded title, and sold the Caravan to K & B Auto for $2,900—more than twice the salvage value of the vehicle. **Ex. 1**, pp. 1, 5, 8-9. Progressive's salvage vendor, as required by federal law, made a report to the National Motor Vehicle Title Information System ("NMVTIS") declaring the Caravan was "Junk and Salvage." **Exhibit 3**, *NMVTIS Report*, p. 4; 49 U.S.C.A. § 30504(a).

K & B made no repairs to the Caravan.[1] On October 27, K & B sold 80-year-old Plaintiff Vogt the Caravan for $6500, just a few hundred dollars less than its pre-crash ACV. **Exhibit 5**, *DOR Bill of Sale*. K & B specifically touted the Caravan's "clean title" multiple times during the

---

[1] K & B's response to a subpoena of "all repair records and reports" indicated the only "repair" performed was to add a fuel cleaner that cost $24.99 from AutoZone. **Exhibit 4**, *K & B subpoena response*, pp. 9, 22.

sale. **Exhibit 6**, *deposition of Plaintiff Vogt*, p. 29:5-15. However, after problems arose with the vehicle, Plaintiff had it examined. Despite the clean title, the repair shop found extensive damage and discovered that the Caravan had been deemed a total loss. **Ex. 6**, pp. 37:5-19. Plaintiff Vogt testified she now cannot sell the vehicle because, "it's worthless. It has no value… I wouldn't want to dupe somebody like I've been duped." **Ex. 6**, pp. 67:10-16. And she's right. To put the van back on the road, she would have to obtain a salvage title, have the vehicle repaired, pass multiple state inspections showing the repairs were made, and then apply for a new clean title. As Progressive already declared, that would cost more than the vehicle is worth.

Discovery revealed Plaintiff is not the only one Progressive duped. Progressive produced basic claims data on 85,969 Missouri total loss vehicles it declared salvage between June 16, 2015 and January 16, 2023. **Exhibit 7**, *Claims Spreadsheet*; **Exhibit 8**, *deposition of Michael Silver*, pp. 46:14- 47:2. All of the 85,969 vehicles were "Progressive Retained Salvage" that were bought by Progressive "as a result of settlement of an insurance claim." **Ex. 8**, pp. 55:5 – 56:19. Progressive obtained clean titles for **42,284** of these vehicles. **Ex. 7** (sorted for "non-salvage (clean)" in column O). Progressive also obtained clean titles for **2,719** vehicles that were damaged in a year no more than 6 years after the manufacturer's model year and had damages exceeding 80% of the pre-accident fair market value. **Exhibit 9**, *Claims Spreadsheet adding Column R* (sorted for: greater than 0.8 in column N; "non-salvage (clean)" in column O; and up to 6 in column R). Progressive continues its unlawful title-laundering scheme despite this litigation. So, these numbers will only increase. Worst of all, the scheme was directed by a specific corporate policy that 1) rewrote § 301.010(55)(a)'s requirements and 2) omitted § 301.010(55)(c)'s requirement entirely. See **Ex. 1**, p. 11-15.

The individual class members will be easily identifiable because Progressive has disclosed the VIN for each vehicle. When the class is defined, the VIN numbers can be used to obtain current motor vehicle records through the Missouri Department of Revenue or purchased through an independent service agreement with private companies.

## III.   CLASS DEFINITIONS

Based upon the law and facts above, Plaintiff respectfully requests the Court certify two classes of individuals who have claims against Progressive for its title laundering scheme:

1. **The "(55)(c)" Class**: All individuals who purchased and currently own a vehicle which Progressive had previously declared salvage as a result of settlement of a claim but for which Progressive obtained a clean title. (MO. REV. STAT. § 301.010(55)(c))

2. **The "(55)(a)" Class**: All individuals who purchased and currently own a vehicle previously sold by Progressive which was damaged during a year that is no more than six years after the manufacturer's model year designation for such vehicle to the extent that the total cost of repairs to rebuild or reconstruct the vehicle to its condition immediately before it was damaged for legal operation on the roads or highways exceeds eighty percent of the fair market value of the vehicle immediately preceding the time it was damaged but for which Progressive obtained a clean title. (MO. REV. STAT. § 301.010(55)(a)).

Plaintiff seeks to be appointed as Class Representative and requests John Simon, Kevin Carnie, Jr., and Patrick McPhail of The Simon Law Firm, P.C. be appointed as Class Counsel.

## **ARGUMENT FOR CLASS CERTIFICATION**

""A class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion.'" *Rilley v. MoneyMutual, LLC*, 329 F.R.D. 211, 215 (D. Minn. 2019) (quoting *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). Certification is appropriate if a class "satisfies Rule 23(a)'s threshold requirements of numerosity, commonality, typicality, and adequacy, and [] fits within 'one of the three subsections of Rule 23(b).'"" *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018). "The Court accepts the substantive allegations in Plaintiffs' complaint as true when determining if the proposed class is acceptable." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d

929, 942 (D. Minn. 2018). "In determining the propriety of a class action, the focus is on whether the class satisfies Rule 23 and not whether the proposed action will prevail." *Id.*

When deciding if a proposed class definition is acceptable, the "Court need not deny certification based on [defendants'] arguments because the Court may redefine the class to accommodate certification." *Id.* In other words, even if "plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of the rule." (quoting 7A Charles A. Wright et al., Federal Practice and Procedure § 1759, at 111–12 (1986)).

## I.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

Rule 23(a) contains four prerequisites for class certification: (1) that the proposed class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims of the representative party are typical of the claims of the class; and (4) that the representative party will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a). These requirements are easily satisfied here.

### A.    Numerosity

Numerosity exists where "the class is so numerous that joinder of all members [of the class] is impracticable." Fed. R. Civ. P. 23 (a)(1). "Courts generally recognize that the existence of 40 or more class members raises a presumption that joinder is impracticable." *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2016 WL 4697338, at *7 (D. Minn. Sept. 7, 2016). "The Eighth Circuit has affirmed the certification of classes with as few as 20 members." *Id.* (citing *Ark. Educ. Ass'n v. Bd. of Educ. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (upholding class of 17–20 members).

There are **42,284** members for the (55)(c) class and **2,719** for the (55)(a) class. Both numbers continue to grow. Rule 23(a)(1)'s numerosity requirement is unquestionably satisfied.

## B. Commonality

Commonality merely requires that one or more questions of law or fact be common among the class members. *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974). This threshold is not demanding. *See Atkins v. United States*, No. 4:15 CV 933 CDP, 2016 WL 3878466, at *3 (E.D. Mo. July 18, 2016). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal quotation marks and bracket omitted). If factual or legal questions "generate common answers apt to drive the resolution of the litigation," the commonality requirement is satisfied. *See id.* at 350 (emphasis and citation omitted). Commonality is generally satisfied when class members have been injured "by the same wrongful act or acts." *H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937, 942 (8th Cir. 2008). Commonality is also satisfied where a uniform challenged policy or conduct applies to all class members. *See Tinsley v. Covenant Care Servs.*, No. 1:14CV00026 ACL, 2016 WL 393577, at *8 (E.D. Mo. Feb. 2, 2016).

The members of the Class have been injured by Progressive's policies and practices. Among the most important, but not the only, common questions of law and fact are:

- Whether Progressive's titling policies—which were followed for every class member's claim—violate Missouri law;
- Whether Progressive failed to disclose the status of vehicles purchased by the class members as salvage, dismantled or rebuilt vehicles;
- Whether vehicles are "declared salvage" when Progressive declares the vehicle a total loss to be obtained in a settlement of a claim to offset its loss.
- Whether vehicles are "declared salvage" when Progressive declares the vehicle is "Progressive Retained Salvage"
- Whether vehicles are "declared salvage" when Progressive's salvage vendor declares the vehicle is "junk and salvage" to the federal government

Any one of these issues can be resolved as to the entire class. Therefore, the commonality requirement of Rule 23 is satisfied.

### C. Typicality

"Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id.* "Class representatives need not share identical interests with every class member, but only common objectives and legal and factual positions." *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1064 (8th Cir. 2013).

Each of the class members' claims arose due to Progressive's practice of failing to disclose the status of the vehicles as salvage, dismantled or rebuilt vehicles. The claims and remedial theories of the class members are identical. The classes are in lockstep. Typicality is satisfied.

### D. Adequacy

The adequacy analysis encompasses two separate inquiries: (1) whether the named plaintiff has common interests with the other class members; and (2) whether the representatives will adequately prosecute the action through qualified counsel. *See Boswell v. Panera Bread Co.*, 311 F.R.D. at 529 (citing *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562–63 (8th Cir. 1982)).

Plaintiff Vogt and the class members share the same interests in establishing the illegality of Progressive's practices and obtaining compensation for vehicles that have no value to ordinary consumers. Their injuries arise from these common practices, and their legal challenges are shared among the Class members. There are no known material conflicts of interest among members of the proposed Classes, all of whom have a similar interest in vindicating their own rights and the rights of the public granted by Missouri's titling statutes.

Moreover, Plaintiffs are represented by attorneys who are "qualified, experienced and able to conduct the proposed litigation." *Van Orden v. Meyers*, No. 4:09CV00971 AGF, 2011 WL

4600688, at *9 (E.D. Mo. Sept. 30, 2011). Plaintiff's counsel are experienced lawyers who are clearly qualified to act as counsel for the class. They have been appointed as lead or co-lead counsel in many contested class actions and recovered substantial amounts for class members. They have been litigating class action claims for many years and have negotiated class-wide settlements in many cases. Counsel have allocated and will continue to commit adequate resources, both staffing and monetary, to ensure that the class is properly represented in this case.

## II.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)

For the reasons discussed below, the Class satisfies Rule 23(b)(2) and Rule 23(b)(3).

### A.  The Putative Class Satisfies the Requirements of Rule 23(b)(2)

A class action is appropriate under Rule 23(b)(2) if "the party opposing the class acted or refused to act on grounds generally applicable to the class, thereby making the appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Rule 23(b)(2) applies only "when a single injunction or declaratory judgment would provide relief to each member of the class . . . [and not] when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. However, this "cohesiveness" requirement is "easily met . . . in cases where . . . the class members were subject to the very practice or policy of the defendant that is being challenged in the lawsuit." *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 345 (S.D. Iowa 2013).

Here, Progressive's unlawful conduct towards Plaintiff and members of the proposed classes was materially identical conduct and the requested injunction and declaratory judgment, if granted, would apply to each respective class member "perforce." *Dukes*, 564 U.S. at 361. There is simply no way to declare a challenged systemic practice illegal as to one consumer without necessarily declaring them illegal as to all consumers.

Injunctive relief compelling Progressive to comply with Missouri law will similarly protect each member of each class—and the public at large—from Progressive's unlawful practices going forward. Progressive's title-laundering scheme is unlawful, and any *new* lawful policies would have to be applied in a consistent way to every salvage vehicle Progressive sells in this state going forward.

Progressive's illegal scheme affects all class members and the injunctive relief sought by Plaintiffs would apply to all such class members; thus, the requirements of 23(b)(2) are met.

### B.  The Putative Class Satisfies the Requirements of Rule 23(b)(3)

A damages class may be maintained under Rule 23(b)(3) if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) a class action is superior to other methods for fairly and efficiently adjudicating the controversy. FED. R. CIV. P. 23(b)(3). Rule 23(b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. *Campbell v. Purdue Pharma, L.P.,* No. 1:02-CV-00163-TCM, 2004 WL 5840206, at *11 (E.D. Mo. June 25, 2004). The proposed classes satisfy this standard.

### C.  Predominance

At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence....If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016). This inquiry "does not require . . . [proof] that each element of [plaintiff's] claim is susceptible to classwide proof." *Boswell*, 311 F.R.D. at 529 (quoting *Amgen Inc.*, 568 U.S. at 469). Instead, determining whether common questions predominate requires only a limited preliminary inquiry

11

into the pleadings to determine whether, if the plaintiffs' allegations are true, common evidence could establish a prima facie case for the class. *Blades v. Monsanto Co*., 400 F.3d 562, 566 (8th Cir. 2005)). "Predominance is a test readily met in certain cases alleging consumer or securities fraud…" *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625, (1997).

"The question at class certification is not whether the plaintiffs have already proven their claims through common evidence." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011). "Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions." *Id.* Here, however, the question of Progressive's liability turns entirely on the evidence supplied in a single spreadsheet that proves liability for every member of the class. Indeed, Plaintiff expects to file a motion for summary judgment on liability based on Progressive's admission that every vehicle in the spreadsheet was determined to be "Progressive Retained Salvage." Sorting the spreadsheet provides every instance that Progressive violated the law by obtaining a "clean" title.

"Certification is appropriate if 'the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Stuart*, 910 F.3d at 375 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "A class may be certified based on common issues '***even though other important matters will have to be tried separately, such as damages*** or some affirmative defenses peculiar to some individual class members.'" *Id.* (emphasis added) (quoting *Tyson Foods*, 577 U.S. at 453). "The potential need for individualized damages inquiries is not sufficient to overcome the district court's findings of predominance and superiority." *Id.* (citing *Tyson Foods*, 577 U.S. at 453). Accordingly, federal courts agree that the need to compute damages "according to some formula, statistical analysis, or other easy or essentially mechanical methods" poses no impediment to class certification. *Klay v.*

*Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) (footnotes omitted), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also*, *e.g.*, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (citing cases); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 67-68 (4th Cir. 1977) (en banc).

Damages can be easily calculated according to a common methodology here. First and foremost, Missouri law allows a victim of fraud the remedy of rescission and restitution. *Scott*, 215 S.W.3d at 181. So, the only thing the class members would need to provide the Court is proof of the amount paid for the vehicle, such as a bill of sale. The issue of damages is completely overshadowed by the common, aggregation-enabling issue of liability in this case.

Even the alternative benefit of the bargain remedy is easily obtained through a common methodology. Plaintiff Vogt has proven K & B did nothing to repair the damage to Caravan that prompted Progressive to total it. As Progressive's corporate representative admitted, a total loss vehicle means "Progressive has determined that it wasn't worth paying to repair the vehicle." **Ex. 8**, p. 47:3-7. And, although an insurance company can sell a salvage vehicle at a salvage auction, the average consumer is not licensed to do so. So, if it isn't worth it to Progressive to repair the vehicle, it certainly won't be for members of the class. The vehicles are literally unusable because they are improperly titled. Restoring them to roadworthiness to be properly titled has already been determined by Progressive to be "not worth it." As Plaintiff Vogt and vehicle appraiser James Walden both testified, these vehicles are worthless in the hands of the average consumer. **Exhibit 10**, *deposition of James Walden*, p. 185:3-7. Finally, even if Progressive would be allowed to speculate that the salvage vehicles have a hypothetical value to someone other than the class members, damages are still susceptible to calculation based on a common methodology. Progressive itself has already calculated the salvage value for the class member's vehicles and

supplied that salvage value in the claims spreadsheet. **Ex. 7**, *column Q*. Subtracting the salvage value (i.e. the actual value) from the price paid by the class member (i.e. the value as represented) easily provides the class wide damages methodology even if Progressive is allowed to argue for this unfounded discount.

### D. Superiority

Finally, Rule 23(b)(3) requires that a class action be the superior method for adjudicating the claims. Certifying a class is the superior way to adjudicate claims when a "class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. In *Amchem*, the Supreme Court noted that one of the purposes underlying Rule 23(b)(3) was "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id*. at 617 (internal citations omitted). "Class actions are superior when the class members' claims are generally small and unlikely to be pursued individually." *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 605 (8th Cir. 2020).

First, the individual damages sought by each Class member will limited to the value of the used car they bought, and therefore unlikely to be substantial enough for individual plaintiffs to attract their own attorneys willing to devote the time and energy to litigate the case. *Tinsley*, 2016 WL 393577, at *11 (finding class mechanism superior "[b]ecause litigation costs would likely exceed any gains from. . . recovery, [so that] class members would be unlikely to litigate individually" (internal citation omitted). "The very premise of class actions is that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 513.

Second, consolidating the litigation in a single class action is far preferable to the alternative of having entire cases litigated tens of thousands of times in this Court. Just the expenses of a single case against a major insurer, alone, will likely exceed any individual recovery. And adjudicating the claims in one forum would avoid duplicative results and eliminate the eliminate the potential for inconsistent judgments. *Perrin v. Papa John's Int'l, Inc.,* No. 4:09CV01335 AGF, 2013 WL 688 5334, at *8 (E.D. Mo. Dec. 31, 2013) ("[A] class action fosters judicial economy and helps to ensure that class members who are otherwise unaware that they possess a claim, or are unable to hire a lawyer, will have their rights represented.").

Finally, as noted above, a class action does not present any insurmountable difficulties in management. The class mechanism is superior because the proposed Class is discrete and identifiable and because adjudicating similar claims together would avoid duplicative trials. Indeed, requiring separate individual lawsuits would likely result in far greater manageability problems, such as duplicative discovery, repeated adjudication of similar controversies, and excessive costs, particularly for Progressive. The judicial economy will therefore be better served if the legality of Progressive's title-laundering is determined in a single class proceeding rather than through a flood of tens of thousands of individual suits.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff requests certification, appointment of Plaintiff as representative of the classes and appointment of the undersigned firm as Class Counsel.

Dated:  November 20, 2023

Respectfully submitted,

**THE SIMON LAW FIRM, P.C**

By:    */s/ Patrick R. McPhail*
John G. Simon, #35231
Kevin M. Carnie Jr., #60979
Patrick R. McPhail, #70242
800 Market Street, Ste. 1700
St. Louis, MO 63101
jsimon@simonlawpc.com
kcarnie@simonlawpc.com
pmcphail@simonlawpc.com
Phone:  314-241-2929
Fax:  314-241-2029

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed via the Court's Electronic Filing

System this November 20, 2023, which will send a notice of electronic filing to all counsel of

record.

*/s/ Patrick R. McPhail*